IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARYLOU ACCIAVATTI,<br><br>        Plaintiff,<br><br>    v.<br><br>THE CHILDREN'S HOSPITAL OF<br>PHILADELPHIA,<br><br>        Defendant. | HONORABLE KAREN M. WILLIAMS<br><br>Civil Action<br><br>No. 20-1327 (KMW/SAK)<br><br><br>**OPINION** |

APPEARANCES:

James A. Bell, IV, Esquire
Christopher Alan Macey, Jr., Esquire
BELL & BELL, LLP
1617 JFK Blvd., Suite 1020
Philadelphia, PA 19103
        Counsel for Plaintiff

Kristine Grady Derewicz, Esquire
Paul J. Sopher, Esquire
LITTLER MENDELSON, PC
Three Parkway
1601 Cherry Street, 14th Floor
Philadelphia, PA 19102
        Counsel for Defendant The Children's Hospital of Philadelphia


**WILLIAMS, District Judge**:

## I.    INTRODUCTION

In this employment disability discrimination and retaliation action, Plaintiff, Marylou Acciavatti ("Plaintiff"), brings suit against, Defendant, The Children's Hospital of Philadelphia ("CHOP"), her former employer, claiming that CHOP discriminated against her based on her disability, failed to accommodate her request for transfer, retaliated against her by issuing a

written warning, and subsequently terminated her employment. Plaintiff asserts these claims pursuant to the Americans with Disabilities Act ("ADA"); the New Jersey Law Against Discrimination ("NJLAD"); the Pennsylvania Human Relations Act ("PHRA"); and the New Jersey Conscientious Employee Protection Act ("CEPA"). For the reasons that follow, the Court will grant Defendant's Motion for Summary Judgment in its entirety.

## II.   BACKGROUND

### A.   Factual And Procedural Background

The following facts are taken from the parties' Statements of Material Facts Not in Dispute submitted pursuant to Fed.R.Civ.P. 56 and L.Civ.R. 56.1a.[1]

Plaintiff began working for CHOP, a leading pediatric hospital and research facility, as an echosonographer, intermittently from 1989 to 2003. Statement of Undisputed Material Facts ("SOF") ¶ 4. Thereafter, Plaintiff was continuously employed by CHOP on a full-time basis from 2008 until her termination on November 25, 2019. SOF ¶ 5. Plaintiff was most recently employed as an Echosonographer II at CHOP's Voorhees, New Jersey Center. SOF ¶¶ 5, 9. In 2019, Plaintiff reported directly to Virginia Brikowski, Operations Supervisor at the Voorhees Center. SOF ¶ 11. It is undisputed that the precursor for this lawsuit is Plaintiff's interaction with the father of a ten-year-old patient on April 19, 2019.

### 1.  THE UNDISPUTED ACCOUNT OF THE APRIL 19, 2019 INCIDENT

On the morning of Friday, April 19, 2019, Plaintiff performed an echocardiogram on a ten-year-old patient who was accompanied by her father. SOF ¶¶ 13-14. The patient's father took

---

[1] Plaintiff's failure to properly address Defendant's Statement of Undisputed Facts has resulted in facts being considered as undisputed pursuant to Federal Rule of Civil Procedure 56(e)(2).

issue with the way Plaintiff confirmed his daughter's identity by including her middle name. SOF ¶ 16. According to the Plaintiff, for the remainder of her examination of the patient, the patient's father "bullied and intimidated" her by pointedly staring at her, making overly sarcastic and rude remarks, and pointing his cell phone in Plaintiff's direction. SOF ¶ 17.

Following the echocardiogram, the patient's father sought to lodge a complaint against Plaintiff with her supervisor. SOF ¶ 24. Ms. Brikowski, in an effort to discuss his concerns privately, led the patient's father into a private room and shut the door. SOF ¶ 23. The patient's father began his complaint by telling Ms. Brikowski that the Plaintiff had incorrectly identified his daughter twice during the procedure. SOF ¶ 24. Plaintiff, while on her way to the restroom, overheard the patient's father telling Ms. Brikowski that Plaintiff needed to go back to school, relearn her job, and that Plaintiff did not know what she was doing and could have killed his daughter. SOF ¶ 27. Plaintiff also overheard the patient's father telling Ms. Brikowski that he was in the military, knows a lot of people, has access to many lawyers, would not hesitate to sue Plaintiff and CHOP, and was going to "come after" Plaintiff and CHOP. SOF ¶ 28. After hearing these statements, Plaintiff became afraid and began knocking on the door of the exam room because she felt she "needed to defend [her]self" and "to protect [her]self." SOF ¶¶ 29, 30. Ms. Brikowski did not respond to Plaintiff's knocking and after several minutes, Plaintiff entered the room and began a heated verbal exchange with the patient's father. SOF ¶¶ 31, 33, 35, 36, 38. After multiple requests by Ms. Brikowski for the Plaintiff to leave the room, Plaintiff left the room. SOF ¶¶ 37, 41.

Immediately after the interaction between the Plaintiff, Ms. Brikowski, and the patient's father, Ms. Brikowski called CHOP's Security Department ("CHOP Security") to report the

incident and directed Plaintiff to also report the incident to CHOP Security, which she did. SOF ¶¶ 55, 57, 58.

On the evening of April 19, 2019, Plaintiff filed a police report with the Voorhees Police Department ("VPD"). SOF ¶ 65. Plaintiff followed up with VPD on July 2, 2019. SOF ¶ 71. Plaintiff did not press charges or file a restraining order against the patient's father. SOF ¶¶ 69, 70.

On April 19, 2019, the patient's father sent an email to CHOP, again complaining about how Plaintiff incorrectly addressed his daughter's name during the visit and her refusal to acknowledge her mistake. SOF ¶ 76.

CHOP Security investigated the incident. SOF ¶ 62. On April 22, 2019, the CHOP Security Manager who oversaw the investigation into the incident concluded that the father did not pose a credible threat of bodily harm to any CHOP employees or patients. SOF ¶¶ 60, 61, 62.

A representative from CHOP's Family Relations Department ("Family Relations") investigated the complaint made by the patient's father and found that Plaintiff acted in accordance with CHOP's patient identification procedures. SOF ¶ 77, 78. However, Family Relations also found that Plaintiff's conduct in entering the exam room uninvited and engaging the patient's father in the manner she did was inappropriate and unprofessional. SOF ¶ 79.

On May 1, 2019, Plaintiff shared the details of the incident with John Kanzleiter, Sr. Human Resources Business Partner and a supervisor to Ms. Brikowski, over the phone. Pl.'s SOF ¶ 108. She expressed her fear of the physical threat that the patient's father posed but felt that Mr. Kanzleiter did not take her threats seriously. Pl.'s SOF ¶ 109. During this discussion, Plaintiff stated she "had to hang up because she [had] to go to the bathroom," but claims Mr.

Kanzleiter forced her to stay on the phone, telling Plaintiff that, "[w]e need to talk about this now," and that he "had questions," and asked, "why would you feel so threatened by [the patient's father]?" Pl.'s SOF ¶ 114, Acciavatti Dep. 217:9-20. Because of these statements, Plaintiff believed that Mr. Kanzleiter mocked her and forced her to stay on the phone despite needing to use the restroom. Pl.'s SOF ¶ 114. After this phone conversation, Mr. Kanzleiter determined that nothing Plaintiff had conveyed to him caused him to believe that the patient's father posed a threat of physical harm to Plaintiff or any other CHOP employees. Kanzleiter Decl. ¶ 22, 23.

## 2.  PLAINTIFF'S INITIAL REQUEST FOR MEDICAL LEAVE

Plaintiff returned to work at the Voorhees Center for her next scheduled shift, Monday, April 22, 2019, and again on Tuesday, April 23, 2019. SOF ¶¶ 83, 84. On Wednesday, April 24, 2019, Plaintiff worked at CHOP's Main Hospital in Philadelphia. SOF ¶ 85. On Thursday, April 25 and Friday, April 26, 2019, Plaintiff called out of work. SOF ¶ 86.

On April 25, 2019, Plaintiff's doctor, Dr. Gillian Lautenbach, provided Plaintiff with a note stating, "Please allow my patient Marylou Acciavatti to work at a different CHOP satellite location to help her with her personal safety. She has had a patient's father threaten her and she feels unsafe at her current site. I think this is very important for her personal and mental safety." SOF ¶ 90. On April 25, 2019, while at her doctor's office, Plaintiff began texting Ms. Brikowski informing her of the doctor's recommendation that she "work off site," that the employer is responsible for protecting "employees from a client who is abusive," and confirming her absence for the next two days. SOF ¶ 92. Plaintiff, via text message, advised Ms. Brikowski of her

availability to work in Mays Landing or the Virtua location beginning in May. SOF ¶¶ 94, 95, 96.

After receiving the text messages, Ms. Brikowski contacted her supervisors, Mr. Kanzleiter and Sharon O'Donnell (Regional Director of Specialty Care) to discuss whether Plaintiff could transfer to a different location; the three of them set up a conference call for Friday, April 26, 2019, to discuss the matter further. SOF ¶¶ 12, 102, 103. During the conference call, the three discussed the prospect of transferring Plaintiff to another location. SOF ¶ 103. Following the conference call, Ms. Brikowski spoke with a physician at the Voorhees Center about Plaintiff's requested transfer. SOF ¶ 107.  Ms. Brikowski does not have the authority to unilaterally grant or deny transfer requests to employees. SOF ¶ 101.

On the evening of April 26, 2019, Plaintiff and Ms. Brikowski spoke on the phone about a permanent transfer to another CHOP New Jersey satellite facility. SOF ¶ 98. According to Plaintiff, during this discussion, Ms. Brikowski denied Plaintiff's requested transfer, told her that she needed to work at the Voorhees Center, and that she needed to show up to work on April 29, 2019. SOF ¶ 99.

Plaintiff returned to work at the Voorhees Center on Monday, April 29, 2019, and provided Ms. Brikowski the note she received from Dr. Lautenbach in connection with her April 26, 2019 visit. SOF ¶ 108. On the morning of April 30, 2019, Ms. Brikowski told Mr. Kanzleiter and Ms. O'Donnell that she received the doctor's note from Plaintiff and inquired about next steps. SOF ¶ 109.

On the afternoon of April 30, 2019, Ms. Brikowski received an email from CHOP's third-party administrator indicating that Plaintiff requested a medical leave of absence with a

return to work date "To Be Determined." SOF ¶¶ 110, 111. Plaintiff requested medical leave under the Family and Medical Leave Act ("FMLA") due to fibromyalgia, her psychological conditions, and problems with her hands due to carpal tunnel syndrome. SOF ¶ 114. In her FMLA certification, Plaintiff's doctor was asked to "[i]dentify the job function(s) the patient is *unable* to perform", accompanying this request for leave, Plaintiff's doctor indicated "Pt is an echo tech – until she is able to get surgery for her hands she will not be able to perform her duties." SOF ¶ 121. Plaintiff's April 30, 2019, request for FMLA was approved from April 30, 2019, to June 1, 2019. SOF ¶ 161.

In light of Plaintiff's indeterminate medical leave of absence, CHOP took no further steps regarding Plaintiff's request to transfer to a satellite location. SOF ¶ 113.

### 3. CHOP'S DISCIPLINARY ACTION TAKEN AGAINST PLAINTIFF RELATED TO THE INCIDENT

CHOP's Rules of Conduct policy applicable to all of its employees, provides in pertinent part: "Employees are expected to behave and interact in a professional manner at all times. Disorderly conduct or disruptive behavior on Hospital property will warrant a Level 4: Final Warning." SOF ¶ 132, 134.

As early as April 22, 2019, Ms. Brikowski communicated with Family Relations about disciplining Plaintiff for her interactions with the patient's father. SOF ¶ 137. On April 30, 2019, after further discussions with Mr. Kanzleiter and Ms. O'Donnell, Ms. Brikowski issued Plaintiff a Disciplinary Action Report, Level 4: Final Warning, for a violation of Rule of Conduct C16 related to her confrontation with the patient's father on April 19, 2019. SOF ¶ 135, 136. The Disciplinary Action Report had no effect on Plaintiff's compensation, job title, job duties, or job functions. SOF ¶ 142.

### 4.  PLAINTIFF'S SUBSEQUENT REQUESTS FOR FMLA, SSI APPLICATION AND WORKERS COMPENSATION CLAIM

#### A.  FMLA

Plaintiff sought and received an extension of FMLA leave from CHOP through July 22, 2019. SOF ¶ 163.  On July 19, 2019, Plaintiff's attorneys sent a letter to CHOP's legal department requesting continued leave and benefits beyond July 22, 2019. SOF ¶ 166.

On August 1, 2019, CHOP responded with a letter to Plaintiff informing her that her FMLA leave had been exhausted and that "[her] position could be posted unless CHOP determines, in discussion with you, that there is a reasonable accommodation that would enable you to perform your essential job duties and that does not pose an undue hardship on CHOP." SOF ¶ 167. In the letter, CHOP also requested that Plaintiff provide an estimated return to work date, if possible, and that she fill out the enclosed Accommodation Request Form. SOF ¶ 168. On August 9, 2019, Plaintiff completed and returned the Accommodation Request Form to CHOP; the only accommodation Plaintiff requested was additional leave until September 23, 2019. SOF ¶¶ 169, 170, 171.  CHOP received the Accommodation Request Form and granted Plaintiff's request extending her medical leave to September 23, 2019. SOF ¶ 176.

After an email exchange between Plaintiff and Mr. Kanzleiter, on September 27, 2019, Plaintiff emailed Mr. Kanzleiter to inform him she anticipated "being able to return to work . . . Monday, October 28." SOF ¶ 181. CHOP granted Plaintiff's request and extended her leave until October 28, 2019. SOF ¶ 183.

On October 25, 2019, Mr. Kanzleiter sent Plaintiff a letter about her upcoming return to work date and informed her that "[i]f you are interested in a transfer to the Main Hospital that option is available to you. Alternatively, you can remain at Virtua Voorhees, and we will make

an effort not to schedule you at that location on days when the family at issue is scheduled for an appointment." SOF ¶ 186. Plaintiff did not request a transfer to a satellite location or request any other accommodation in response to Mr. Kanzleiter's letter. SOF ¶¶ 187, 188, 189. Instead, on October 28, 2019, the day Plaintiff was to return to work, Plaintiff's attorney contacted CHOP's legal department informing them they would like to negotiate a severance package in exchange for Plaintiff's resignation and a release of her alleged employment claims against CHOP. SOF ¶ 190. CHOP rejected Plaintiff's offer. SOF ¶ 191.

Upon learning that Plaintiff was not returning to work on October 28, 2019, and that Plaintiff had failed to provide any foreseeable return-to-work date, Lawrence Barnes, Director of Cardiology, assessed the ongoing burden Plaintiff's indefinite leave had and was having on CHOP at the Voorhees Center. SOF ¶ 220. Mr. Barnes determined that Plaintiff's indefinite leave with no foreseeable return-to-work date posed an undue burden on CHOP from both an operational and financial standpoint. SOF ¶ 221. Accordingly, Mr. Barnes, in consultation with representatives from CHOP's Human Resources and Legal Departments, decided to terminate Plaintiff's employment. SOF ¶ 222. On November 25, 2019, Mr. Kanzleiter sent Plaintiff a letter notifying Plaintiff of her termination effective November 25, 2019. SOF ¶ 223.

### B. Disability Benefit Applications

On May 1, 2019, Plaintiff submitted a request for short-term disability benefits. Kanzleiter Decl., Ex. 1. On a portion of the form instructing doctors to list the Plaintiff's restrictions and limitations, Plaintiff's doctor listed "unable to work," and that her limitations were "total," beginning April 30, 2019. SOF ¶ 123, 124. As a result of her application, Plaintiff qualified for and received short-term and long-term disability benefits. SOF ¶ 125.

On September 11, 2020, Plaintiff applied for Social Security Disability Insurance ("SSDI") benefits. SOF ¶ 126. In her application, she stated the start date of her disability was April 30, 2019. SOF ¶ 127. When asked in her SSDI benefits application "What were you able to do before your illnesses, injuries, or conditions that you can't do now?", Plaintiff responded, "Everything and anything." SOF ¶ 128. When asked "How do your illnesses, injuries, or conditions limit your ability to work?" Plaintiff replied:

> I am in constant pain with my bones, joints and my muscles in addition to my Fibromyalgia/Neuropathy, bilateral mastectomy due to scar tissue pain, bilateral wrist [sic] endonitis, carpal tunnel syndrome release, DeQuervain's Bilateral Tenosynovitis, right and left lateral epicondylitis of elbows, history of migraines, lumbosacral spondylosis without myelopathy, chronic pain syndrome, lumbar facet arthropathy, lumbar discogenic pain syndrome, complications related to right breast reconstruction, chest pain, palpitations and hypertension/lightheadedness.

SOF ¶ 129. She also reported in her SSDI application that her illnesses and conditions affect her "lifting, squatting, bending, standing, reaching, walking, kneeling, stair climbing, memory, completing tasks, concentration, following instructions, and using hands." SOF ¶ 130.

## C. Worker's Compensation

On June 10, 2019, Plaintiff filed two worker's compensation petitions seeking benefits from CHOP related to her disability. SOF ¶ 155. In connection with her worker's compensation petition, on August 1, 2019, Plaintiff testified as follows:

> Q.    Now you testified that you - you last worked for Children's Hospital in New Jersey, Voorhees, New Jersey campus on the 29th of April. Correct?
>
> A.    Yes.
>
> Q.    And at that time, you were experiencing pain and symptoms in your – both arms?
>
> A.    Yes.

Q.     The whole day that you were working?

A.     Yes.

Q.     And you stopped working after the 29th. Correct?

A.      Yes.

Q.     And why did you stop working after the 29th?

A.     I took FMLA because I was in pain.

Q.     Okay. For what parts of your body were you in pain that is subject to your FMLA?

A.     My hand, my wrist, my back and I also have fibromyalgia. I'm twisted in pain.

SOF, Ex. I at 96. Plaintiff further testified on November 17, 2020, to the following:

Q.     At any time since you've left your job at Children's Hospital do you feel that you were physically capable of returning to work?

A.     Honestly, no.

Q.     Okay. Let me clarify that. Since you've left your job at Children's Hospital in April of 2019, do you feel that you were physically capable of returning to your job as an echosonographer without any restriction?

A.     No, no, absolutely not. My right hand is numb 24/7. It wakes me up in my sleep every night.

Q.     Okay. Since you left work in April of 2019, do you think -- do you feel that you've been physically capable of returning to work at any capacity, like, modified duty or anything like that?

A.     I mean, with -- with all the pain that I'm in, I don't feel like I can function right now. Actually, I don't feel like I can function mentally or physically or emotionally.

Q.     Okay. And you feel that way since you left work in April of 2019, that you could not have functioned physically, mentally or emotionally in a work environment? Is that -- is that your testimony?

A.     Yes.

SOF, Ex. J at 26:19- 27:16. On February 7, 2020, Plaintiff commenced this suit against CHOP. In this suit, Plaintiff admits that she was completely physically incapable of working as an echosonographer as of at least October 23, 2019, when she underwent hand surgery, and will remain physically incapable for an indeterminate period. SOF ¶ 116. She further testifies that she could have worked between May 1, 2019 (when she first started her FMLA leave) up until October 23, 2019 (the day she underwent surgery on her hand) if CHOP had granted her request for an accommodation and transferred her to another New Jersey satellite facility. SOF ¶ 117.

Discovery is complete and CHOP now moves for summary judgment.

## III.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) generally provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact" such that the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute of "material" fact exists where a reasonable jury's review of the evidence could result in "a verdict for the non-moving party" or where such fact might otherwise affect the disposition of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts, however, fail to preclude the entry of summary judgment. *Id.* In evaluating a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party and must provide that party the benefit of all reasonable inferences. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Halsey v. Pfeiffer*, 750 F.3d 273, 287 (3d Cir. 2014). However, any such inferences "must flow directly from admissible evidence," because " 'an inference based upon [ ] speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment.'" *Halsey*, 750 F.3d at 287 (quoting

*Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n. 12 (3d Cir. 1990); citing *Anderson*, 477 U.S. at 255.

A factual dispute is material when it "might affect the outcome of the suit under the governing law," and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The non-moving party "'need not match item for item, each piece of evidence proffered by the movant,'" but simply must present more than a 'mere scintilla' of evidence which a jury could reasonably find for the non-moving party. *Boyle v. Cnty of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (quoting *Anderson*, 477 U.S. at 252).

## IV.    DISCUSSION

Simply stated, all of Plaintiff's claims fail because: (1) it is undisputed that as of April 30, 2019, she was unable to perform the essential functions of her job; (2) the undisputed facts, even when viewed through the lens most favorable to Plaintiff and providing all reasonable inferences, do not militate in favor of a claim for hostile work environment or retaliation which are based solely on her interaction with a patient's father on April 19, 2019.

### A.    Disability Discrimination Claims

First, the Court will address Plaintiff's claims of disability discrimination and retaliation under the ADA, NJLAD, and PHRA.[2] Plaintiff contends that CHOP failed to reasonably

---

[2] The legal analysis is the same in determining whether Plaintiff has established a prima facie case of disability discrimination based on the ADA, NJLAD and PHRA. *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 306 (3d

accommodate her disability, failed to engage in the interactive process, and unlawfully terminated her employment on the basis of her disability. Fundamentally, the ADA bars an employer from "discriminat[ing] against a qualified individual on the basis of a disability." 42 U.S.C. § 12112(a). To establish a prima facie case of discrimination under the ADA, the plaintiff must show that he or she: (1) possessed a qualifying disability under the ADA; (2) otherwise was qualified to perform the essential functions of her job, with or without reasonable accommodations; and (3) suffered an adverse employment action as a result of discrimination. *Gaul v. Lucent Technologies*, 134 F.3d 576, 580 (3d Cir. 1998); *Lescoe v. Pa. Dept. of Corrections*, 464 F.App'x 50, 52 n.6 (3d Cir. 2012). If the plaintiff establishes a prima facie case, a presumption of discrimination arises, and the burden of production shifts to the defendant to offer evidence of a "legitimate, nondiscriminatory reason for the adverse employment action." *Hatch v. Franklin Cnty.*, 755 F. App'x 194, 198 (3d Cir. 2018). Thereafter, the plaintiff must show by a preponderance of the evidence that the defendant's proffered explanation was pretext for discrimination. *Id.*

> 1. **Plaintiff cannot establish a prima facie case of disability discrimination because she could not perform the essential functions of her job with or without accommodation**

Plaintiff's disability claims fail for one paramount reason: the record is simply devoid of any facts to demonstrate that Plaintiff was qualified to perform the essential functions of her job, with or without reasonable accommodations.[3] The undisputed record evidence establishes that both Plaintiff and her doctors confirmed that she was incapable of performing her job as an

---

Cir. 1999); *Fado v. Kimber Manufacturing, Inc.*, 11-4772, 2016 WL 3912852, at *5 (D.N.J. July 18, 2016); *Victor v. State*, 203 N.J. 383, 415-16 (2010).

[3] The Court accepts that as of April 30, 2019, Plaintiff may have had a qualifying disability.

echosonographer. Plaintiff's doctors described her disability as "total" and noted as early as April 29, 2019, "[u]ntil [Plaintiff] is able to get surgery for her hands she will not be able to perform her duties." SOF ¶ 121, 124. Similarly, in her application for disability and worker's compensation, Plaintiff's doctors and Plaintiff herself repeatedly provided testimony that she is totally incapable of performing her duties as an echosonographer. Plaintiff testified that she was in "constant pain with [her] bones, joints and [her] muscles," due to a long list of conditions; that since the date her disability began on May 1, 2019 she could no longer do "anything or everything" that she was able to do prior; when asked if she could return to work, Plaintiff stated, "no, no, absolutely not;" and when asked if she could physically return to work on modified duty, she claimed that she could not function "mentally or physically or emotionally." SOF ¶¶ 118, 128, 129. Nowhere in Plaintiff's FMLA, SSDI, or worker's compensation applications, or sworn testimony thereto, is there any indication that she could perform the essential functions of an echosonographer, even if she were transferred to another location.

The Court finds *Motley v. New Jersey State Police*, 196 F.3d 160 (3d Cir. 1999) instructive on this issue. There, the court affirmed the district court's grant of summary judgment to defendants when the plaintiff filed an ADA claim after certifying he was "permanently and totally disabled" in an application for an enhanced disability pension. *Id.* at 162-63. The court further clarified that although courts should not assume that an individual's ADA claim is barred merely because prior representations or determinations of disability exist in the record, in order to avoid having an ADA claim dismissed, a plaintiff must provide an explanation "sufficient to warrant a reasonable juror's concluding that, assuming the truth of or his good faith belief in the earlier statement, [the plaintiff] could nonetheless perform the essential functions of [his or her] job, with or without a reasonable accommodation." *Id.*, 196 F.3d at 165-66. The court stated that

an ADA plaintiff must offer a substantial explanation to explain divergent positions taken, and because the plaintiff had "failed to proffer a reasonable explanation for his inconsistent statements," the plaintiff could not establish that he could perform the essential functions of his job. *Id.*

Here, Plaintiff has failed to sufficiently explain the fundamental inconsistencies between her testimony in her SSDI application, worker's compensation hearing, FMLA applications and her testimony in this case. Rather, Plaintiff merely contradicts her previous sworn statements and testimony. It is clear that "[a] party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Management Sys. Corp.*, 526 U.S. 795, 806 (1999). Nor can an ADA Plaintiff "simply ignore her SSDI contention that she was too disabled to work." *Id.* at 798. Plaintiff's applications for SSDI, FMLA, and worker's compensation, as well as multiple doctors' notes certify that she was totally unable to perform her job functions as of May 1, 2019; Plaintiff fails to explain the inconsistencies. These undisputed facts lead to only one conclusion, Plaintiff has not established that she could perform the essential functions of her job with or without an accommodation.[4]

The Court is convinced that summary judgment is appropriate for Plaintiff's disability discrimination claim because, upon the facts of the record, Plaintiff cannot meet her prima facie

---

[4] Plaintiff's last day of work was April 29, 2019. On April 30, 2019, Plaintiff began her medical leave; however, because her doctors listed May 1, 2019, as the date on which her disability began, her FMLA started on May 1, 2019. In Plaintiff's SSDI and Worker's Compensation applications she listed April 30, 2019 as the start date of her disability. The Court notes that the one-day distinction between the two competing operative dates is without consequence for purposes of this Opinion.

burden pursuant to any of the proposed legal theories. In light of this conclusion, the Court need not even consider pretext.

### 2.   Reasonable Accommodation Claim

The ADA specifically provides that an employer "discriminates against a qualified individual with a disability when the employer" fails to "mak[e] reasonable accommodations to the individual's known physical or mental limitations." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) (quoting 42 U.S.C. § 12112(b)(5)(A)). In order to survive summary judgment on a failure to accommodate claim under the ADA, however, Plaintiff must specifically point to evidence in the record sufficient to establish that: (1) she requested an accommodation; (2) CHOP failed to make a good faith effort to assist in accommodating such disability; and (3) she could have been reasonably accommodated. *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 157 (3d Cir. 2017); *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006).

Plaintiff's failure to accommodate claim is premised on two theories. *First,* Plaintiff claims that CHOP failed to transfer her to another New Jersey satellite location after the incident with the patient's father. *Second*, Plaintiff argues that CHOP did not provide her additional extended medical leave and instead terminated her employment. Both of Plaintiff's theories fail for the same reason her disability discrimination claim fails. Plaintiff cannot establish that she could have performed the essential functions of her job — a necessary element for the need to accommodate to arise. *Capps*, 847 F.3d at 157 (holding that to survive summary judgment a plaintiff must specifically point to evidence in the record sufficient to establish that he or she could have been reasonably accommodated.).

Moreover, it is undisputed that CHOP made a good faith effort to accommodate Plaintiff's disability, including consideration of Plaintiff's request to transfer. The time frame and CHOP's responses to Plaintiff's request are instructive. Notably, Plaintiff first notified Ms. Brikowski of her intent to request a transfer on April 25, 2019. SOF ¶ 92. Upon learning of Plaintiff's request, Ms. Brikowski alerted her supervisors to Plaintiff's request, and they began discussions about the possibility of transferring Plaintiff. SOF ¶¶ 102, 103. Ms. Brikowski also spoke to a physician at the Voorhees Center about the requested transfer. SOF ¶ 107. On April 29, 2019, Plaintiff gave Dr. Lautenbach's note substantiating her request for a transfer, but one day later, on April 30, 2019, Plaintiff went out on FMLA leave. SOF ¶¶ 108, 110. In light of Plaintiff's medical leave of absence, CHOP took no further steps regarding Plaintiff's requested transfer and Plaintiff never again requested a transfer. SOF ¶¶ 112, 113. As such, Plaintiff has failed to make out a prima facie case for a reasonable accommodation claim.

### B. Retaliation Claim

Plaintiff asserts two retaliatory actions by CHOP. *First*, Plaintiff alleges that CHOP issued her a written warning in retaliation for requesting an accommodation. *Second*, Plaintiff alleges that CHOP terminated her in retaliation for requesting an accommodation. As demonstrated below, neither of these claims are supported by the undisputed factual record.

To establish a prima facie case of retaliation, a plaintiff must show: (1) a "protected employee activity;" (2) an "adverse action by the employer either subsequent to or contemporaneous with the protected activity;" and (3) "a causal connection between the protected activity and the adverse action." *Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005). If the employee establishes a prima facie case for retaliation, the burden then shifts to the employer

to advance a legitimate, non-retaliatory reason for its adverse employment action. *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997).

### 1. Plaintiff's retaliation claims based on the written warning fails because it did not constitute an adverse action

"An actionable adverse employment action is 'a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different job responsibilities, or a decision causing a significant change in benefits.'" *Betts v. Summit Oaks Hosp.*, 687 F. App'x 206, 207 (3d Cir. 2017) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). It must be "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment. *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001). A written warning that does not result in any material change in the terms or conditions of a plaintiff's employment cannot be considered an adverse employment action for purposes of a plaintiff's prima facie case of retaliation. *Mieczkowski v. York City Sch. Dist.*, 414 F. App'x 441, 446-47 (3d Cir. 2011).

Plaintiff argues that the written warning she received constitutes an adverse employment action because, despite thirty years of employment without a single instance of disciplinary action, warning, or reprimand, she was issued a "Final" written warning even though it was confirmed that she had done nothing wrong. Defendant argues that the written warning is not an adverse employment action because it did not change any material terms or conditions of Plaintiff's employment. The Court agrees with Defendant. Plaintiff does not present any evidence that the written warning resulted in any change in her employment status. While Plaintiff asserts that the written warning caused her embarrassment and humiliation at work,

19

substantial stress and anxiety, and exacerbated her mental health issues and fibromyalgia pain, Pl.'s SOF ¶¶ 198-200, these emotional responses to the issuance of the warning do not amount to an adverse employment action by her employer.

Further, the undisputed record evidence establishes that Plaintiff was disciplined because of her interactions with the patient's father, not because of her request for an accommodation. Moreover, in accordance with the investigative findings of Family Relations, Plaintiff acted inappropriately and unprofessionally by engaging with the patient's father. Consequently, CHOP's Rules of Conduct policy applicable to Plaintiff's conduct "warranted a Level 4: Final Warning."

Plaintiff's retaliation claims under the NJLAD and PHRA fail for the same reason. Plaintiff cannot establish that the written warning was an adverse employment action. *See Victor v. State*, 401 N.J. Super. 596, 616 (App. Div. 2008), *aff'd as modified*, 203 N.J. 383 (2010) (holding that under the NJLAD an adverse action "must rise above something that makes an employee unhappy, resentful, or otherwise cause an incidental workplace dissatisfaction."); *see also Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (finding that under the PHRA, an adverse employment action is "an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."). Again, nothing in the record evidence indicates that the written warning altered Plaintiff's employment status in any way.

**2. Plaintiff cannot establish that her termination at the conclusion of her FMLA leave was retaliatory**

Plaintiff cannot satisfy the final element of a prima facie case for retaliation. Simply stated, Plaintiff cannot establish a causal connection between her request for an accommodation and her termination.[5] A causal connection can be established by providing direct or circumstantial evidence of (1) unusually suggestive temporal proximity; (2) a pattern of antagonism following the protected activity; or (3) a showing that the reason for his alleged adverse action is pretextual." *Leboon v. Lancaster Jewish Cmty. Ctr. Ass'n.*, 503 F.3d 217, 232 (3d Cir. 2007).

To satisfy this element at the summary judgment stage, Plaintiff must proffer evidence that establishes a causal link between her request for an accommodation in April 2019 and CHOP's termination of her employment on November 25, 2019.  Plaintiff argues that a causal connection is strongly evidenced by the proximity of her request for an accommodation and the date of her termination, and by the lack of legitimate reasons for her termination. However, the Court finds that the lengthy seven-month gap between these two events is too great to establish causation. *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) ("A gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment."). Additionally, Plaintiff's contention that CHOP lacked a legitimate reason for terminating her in the face of her failure to provide an expected return to work date after a seven month leave of absence belies all reason.

---

[5] Neither party disputes that termination is an adverse employment action.

Furthermore, there are no facts establishing that CHOP engaged in a pattern of antagonism. To the contrary, CHOP extended Plaintiff's medical leave three times and offered options to accommodate her return. Plaintiff instead solicited a severance and sought to resign. Ultimately, Plaintiff simply failed to return to work. Not only do these facts fail to establish a pattern of antagonism, they conclusively demonstrate the non-pretextual reason for Plaintiff's termination — her inability to return to work. Therefore, Plaintiff cannot establish a causal connection between her request for an accommodation and her termination.

### C. Plaintiff cannot establish a prima facie case under CEPA

To establish a prima facie case under the New Jersey Conscientious Employee Protection Act ("CEPA"), a plaintiff must establish by a preponderance of the evidence that: (1) she reasonably believed that her employer's conduct was violating either a law or a rule or regulation promulgated pursuant to law; (2) that she performed whistle-blowing activity described in CEPA; (3) an adverse employment action was taken against her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action. *Blackburn v. United Parcel Service, Inc.*, 179 F.3d 81, 92 (3d Cir. 1999) (citing *Kolb v. Burns*, 727 A.2d 525, 530 (N.J. Super. Ct. App. Div. 1999)).

Here, Plaintiff's factual basis to support her CEPA claim is wholly unsupported by the undisputed record evidence. Plaintiff argues that "permitting a violent patron on the premises, who made physical threats of violence, with a history of violence was illegal or incompatible with a clear mandate of public policy concerning the public health, safety or welfare." Pl.'s SOF ¶ 194; Pl. Br. [ECF No. 38-2] 28. Although it is undisputed that Plaintiff perceived a threat to her safety based on her interactions with the patient's father on April 19, 2019, these undisputed

22

facts do not implicate CEPA for one paramount reason: Plaintiff does not identify any facts to establish that CHOP's conduct violated either a law, a rule, or a regulation promulgated pursuant to law. To this end, there is absolutely nothing in the record that this Court could reasonably construe to establish that CHOP permitted a violent patron or one with a history of violence on its premises. Moreover, as discussed in detail supra, Plaintiff does not suffer an adverse employment action. For these reasons Plaintiff's CEPA claim fails.

### D. Plaintiff cannot establish a prima facie case of Hostile Work Environment

To establish a cause of action for a hostile work environment under the NJLAD, a plaintiff must demonstrate "that the complained-of conduct (1) would not have occurred but for the employee's protected status and was (2) severe or pervasive enough to make a (3) reasonable person believe that (4) the conditions of employment have been altered and that the working environment is hostile or abusive." *Estabrook v. Safety & Ecology Corp.*, 556 F. App'x 152, 156 (3d Cir. 2014) (quoting *Shepherd v. Hunterdon Developmental Ctr.*, 174 N.J. 1, 24 (2002)).

Here, Plaintiff claims that she was harassed on the basis of her disability because she was subjected to a hostile working environment during a single telephone call between her and Mr. Kanzleiter wherein, she perceived his response to her report of the incident between her and the patient's father as subjecting her to a severe and pervasive hostile work environment. Specifically, Plaintiff claims that while on the phone with Mr. Kanzleiter, she had to go to the restroom, but she felt forced to stay on the phone and answer Mr. Kanzleiter's questions about the incident between her and the patient's father. Pl.'s SOF ¶ 114; Pl.'s Br. 26-27. The Court finds that these statements made during a single conversation when viewed in the appropriate context, do not satisfy any of the elements of a hostile working environment claim. *See*

*Castleberry v. STI Group*, 863 F.3d 259, 265 (3d Cir. 2017) (finding that an isolated incident of harassment does not amount to harassment unless "extremely serious" or "severe."). Nothing that Plaintiff alleges occurred during this conversation is conceivably severe or pervasive enough to make a reasonable person believe that the conditions of her employment were altered, and she was subjected to a hostile work environment.

## V.   CONCLUSION

The Court will grant Defendant's motion for summary judgment on all claims. No reasonable jury could conclude that Plaintiff was discriminated against under the ADA, NJLAD, and PHRA, and as a result her reasonable accommodation and hostile work environment claims fail. In addition, no reasonable jury could conclude, based on the undisputed evidence, that Defendant retaliated against Plaintiff.

An accompanying Order will be entered.

Dated: June 28, 2022

KAREN M. WILLIAMS
United States District Judge